**BRW, INC., and Professional Service Industries, Inc., Petitioners,**

v.

**DUFFICY & SONS, INC., d/b/a/ Central Denver Ironworks, Inc., Respondent.**

**No. 03SC104.**

Supreme Court of Colorado.

Oct. 4, 2004.

---

Holland & Hart, LLP, Daniel R. Frost, Elizabeth A. Phelan, Joseph W. Halpern, Denver, for Petitioner BRW, Inc.

Kennedy, Christopher, Childs & Fogg, P.C., John R. Mann, Denver, for Petitioner Professional Services Industries, Inc.

Cage, Williams, Abelman & Layden, P.C., Alvin M. Cohen, Denver, for Respondent Dufficy & Sons, Inc.

Jackson Kelly, PLLC, Philip B. Cardi, Timothy M. Schulte, Denver, for Amici Curiae American Council of Engineering Companies of Colorado, The American Institute of Architects of Colorado, Structural Engineers Association of Colorado, and Colorado Association of Geotechnical Engineers.

Senn Visciano Kirschenbaum Merrick P.C., Mark D. Gruskin, Luis A. Toro, Denver, for Amici Curiae American Subcontractors Association, American Subcontractors Association of Colorado, and Colorado Contractors Association.

HOBBS, Justice.

We granted certiorari to review the court of appeals decision in *Dufficy & Sons, Inc. v. BRW, Inc.*, 74 P.3d 380 (Colo.App.2002).[1] Dufficy & Sons, Inc. ("Dufficy") was involved in a construction project ("the Project") as a subcontractor. BRW, Inc. ("BRW"), a licensed engineer, designed the plans and specifications for the Project. Dufficy's contract required it to follow BRW's plans and specifications. BRW hired Professional Service Industries, Inc. ("PSI") to inspect the Project's construction and ensure that the general contractor and subcontractors were following BRW's plans and specifications.

Dufficy encountered problems with the Project resulting in economic loss. Dufficy filed suit against BRW and PSI, asserting claims for negligence and negligent misrepresentation. The trial court dismissed Dufficy's claims because it found the economic loss rule applicable to bar the tort claims. The court of appeals reversed; it held that BRW, as a licensed engineer, and PSI, as an inspector, owed subcontractors an independent duty of care. Under the court's reasoning, the economic loss rule did not bar the negligence and negligent misrepresentation claims because BRW and PSI owed Dufficy an independent duty of care under tort law, even though the claims arose from interrelated contracts.

We reverse the court of appeals. Our economic loss rule requires the court to focus on the contractual relationship between the parties, rather than their professional status, in determining the existence of an indepen-

---

1. We granted certiorari on the following issue: Whether the economic loss rule is a defense in a tort suit for claims of negligent breach of a duty and for negligent misrepresentation by a subcontractor against a design engineer and its agent when no contract exists between the parties.

dent duty of care. The interrelated contracts in this case contained BRW's and PSI's duty of care. Dufficy's tort claims are based on duties that are imposed by contract and therefore, contract law provides the remedies. Accordingly, the economic loss rule bars Dufficy's tort claims.

## I.

This lawsuit arises out of a City and County of Denver construction project, for two steel bridges on Speer Boulevard over the Platte River. The City contracted with BRW to obtain "professional services for the design and construction administration of the Speer Boulevard Bridges." BRW agreed to "perform professional Engineering and Architectural Services for the City in connection with the planning, designing, bidding and construction observation of the Project as specified in this Agreement."

The BRW contract sets out BRW's standard of care and its duties. Specifically, BRW agreed to complete all work performed under the BRW contract "in accordance with the standards of care, skill and diligence provided by competent professionals who perform work or services of a similar nature." BRW also agreed that its drawings and specifications for the Project would "represent a thorough study and competent solu-

2. The Contract Documents include a list of instruments, drawings, and documents, including the Standard Construction Plans and Specifications, the General Contract Conditions, and the

tion for the Project as per usual and customary professional standards and shall reflect all architectural and engineering skills applicable to that phase of the Project." BRW also agreed to inspect the performance of the contract to determine that the work "has been or is being installed in conformance with the Contract Documents." [2]

As required by the BRW contract, BRW completed the drawings and specifications for the Project. Subsequently, the City invited bids from general contractors. Edward Kraemer & Sons, Inc. ("Kraemer") was the successful bidder and entered into a contract with the City providing that Kraemer would serve as the general contractor for the Project.

Kraemer then subcontracted with Anko Metal Services, Inc. ("Anko") for the fabrication, painting, and shipment of structural steel. In turn, Anko subcontracted with Dufficy for the fabrication, painting, and shipments of portions of the structural steel. Dufficy subcontracted with Coblaco Services, Inc. to apply the topcoat and primer ("shop coatings") and with Sherwin–Williams to supply paint products for the Project. BRW contracted with PSI to inspect "all of the work at issue." The following diagram illustrates the interrelated contractual relationships:

Project Plans and Drawings.

Kraemer and all of its subcontractors, including Dufficy, were contractually obligated to build the Project in accordance with BRW's design drawings and specifications. For example, Dufficy's contract with Anko required Dufficy to fabricate, paint, and ship structural steel for the Project, in accordance with BRW's plans and specifications. Likewise, the contract between Kraemer and the City incorporated BRW's plans and specifications.

Kraemer's and all of its subcontractors' contracts also included a provision requiring the contractual parties to resolve "disputes of any nature whatsoever regarding the Contract" pursuant to the City's administrative claims procedure, D.R.M.C. section 56–106. The remedy provision binds the general contractor and its subcontractors and suppliers to this dispute resolution process:

> The Contractor expressly agrees that this dispute resolution process is the only dispute resolution mechanism that will be recognized by the parties for any claims put forward by the Contractor, notwithstanding any other claimed theory of entitlement on the part of the Contractor or its subcontractors or suppliers.

The Project incurred unexpected delays due to application of the primer and top-coat, and the cure period ("paint system"), which resulted in economic loss to Dufficy. In compliance with Dufficy's contractual remedy, Dufficy, through Kraemer, submitted claims to the City for administrative review on April

24, 2000.[3] All of the claims were based on additional expenses incurred in connection with the delays caused by the paint system.

In its administrative complaint, Dufficy and Kraemer alleged that BRW, PSI, and the City were responsible for the delay and the increased costs. Dufficy argued that BRW required the use of a paint system that was inappropriate for Denver's altitude and arid climate.[4] Dufficy explained that BRW required an inorganic, zinc-rich primer to be fully cured at the faying surfaces (overlapping bolted surfaces) and an intermediate coat to be applied in the shop prior to shipping. Under Denver's climatic conditions, the primer took more than two months to cure. Consequently, Dufficy could not perform its duties of reassembling the steel members. Dufficy claimed that it "expended enormous administrative time and effort in attempting to improve the performance of the primer."

Additionally, Dufficy contended that PSI delayed its inspection of the Project, greatly magnifying Dufficy's difficulty. Had PSI inspected the Project on time, Dufficy argued, it would have been "in a better position to address the problems in an efficient and cost-effective manner." It also argued that PSI improperly instructed Coblaco to perform its duties in a way that caused problems with the paint system.

On October 25, 2000, prior to any administrative ruling, Dufficy filed a complaint in the District Court of Denver against BRW, PSI, Sherwin–Williams, and Coblaco. Only the tort claims against BRW and PSI are the subject of this appeal.

Dufficy's district court complaint and its administrative claim with the City are based on the same factual allegations. Dufficy's amended complaint alleges that, when the erection of the steel for the first bridge was to commence, the shop coatings "cured too slowly, inconsistently, in some instances nev-

er cured, and failed in numerous areas by peeling and falling off steel components." The slow cure time increased the costs of Dufficy's performance and "caused delays in completing the Project, resulting in significant damages to Dufficy & Sons." For example, Dufficy had to repair some of the paint on the steel that had peeled off, and the delay decreased its labor productivity.

In Dufficy's negligence action against BRW, Dufficy alleged that BRW failed to exercise reasonable care when: (1) preparing design drawings and specifications for the Project involving the paint system; (2) investigating whether requiring implementation of the paint system was justified; and (3) administering the contract documents. Dufficy also asserted a negligence claim against PSI alleging that PSI failed to exercise reasonable care when inspecting the Project.

Dufficy also brought a negligent misrepresentation claim against BRW and PSI. Dufficy claimed that BRW, through its agent, PSI, made negligent misrepresentations regarding the paint system. Dufficy argued that PSI inaccurately "represented to Dufficy ... that Coblaco was performing its contractual obligations with Dufficy ... in strict accordance with Sherwin–Williams' instructions and the Contract Documents."

Dufficy sought only economic damages for these claims. The amended complaint requested "a money judgment consisting of the sum of actual and consequential damages, the cost and expense of bringing this action, including attorneys' fees, prejudgment interest, and exemplary damages ..., treble damages, and such other ... relief."

BRW moved to dismiss and PSI moved for summary judgment. The trial court granted BRW's motion and Dufficy subsequently moved for reconsideration. The trial court granted PSI's motion and denied Dufficy's motion for reconsideration. The trial court

---

3. Dufficy initially submitted its claims directly to the City. However, the City informed Dufficy that, as a subcontractor, it had to file its claims through the general contractor, Kraemer, pursuant to the Kraemer contract.

4. According to documents filed at the administrative proceeding by Kraemer, "a prominent

paint-failure analysis firm attributed the poor cure performance of the primer to 'the arid environment of the Denver, Colorado area not being conducive to inorganic zinc cure'-that is, Denver's climate is too high and dry for a moisture-dependent inorganic zinc-rich primer to perform properly."

found that, even though Dufficy had not contracted directly with PSI or BRW, the economic loss rule applied, barring Dufficy's claims because they arose from and were subject to the interrelated contracts.

The trial court emphasized that the Project was controlled by a "network of contracts" and all parties were "contractually obligated to build the project in accordance with BRW's plans and specifications." The trial court explained that the factual context of this case supported the application of the economic loss rule because the project was " 'layered' upon multiple contracts, all of which require[d] compliance with the BRW plans and specifications, entered into by commercial parties capable of contractually protecting their respective economic expectations." Dufficy appealed the trial court's order to the court of appeals.

Before the court of appeals issued its decision, the City's manager of Public Works denied Dufficy's and Kraemer's claims. Dufficy and Kraemer requested a formal hearing pursuant to the dispute resolution provisions in the Contract Documents.

The court of appeals thereafter reversed the trial court. With respect to BRW, it held that the economic loss rule did not preclude Dufficy's tort claims in this action, because a licensed engineer owes an independent duty of care under tort law to the contractors and subcontractors with respect to the plans and specifications drafted and prepared by the engineer and relied upon by the contractor or subcontractor. With respect to PSI, the court also concluded that inspectors owe the same duty of care as engineers. Specifically, PSI owed Dufficy an independent duty of care in inspecting and directing the Project. Under the court's reasoning, the economic loss rule did not bar the negligence and negligent misrepresentation claims because BRW and PSI owed Dufficy an independent duty of care under tort law, even though the claims arose within a contractual relationship.

After the court of appeals decision in this case, Dufficy, Kraemer, and the City settled and agreed to dismiss the administrative appeal. The settlement agreement preserved Dufficy's right to bring claims arising out of the Project against Kraemer, BRW, and PSI. We reverse the court of appeals.

## II.

Our economic loss rule requires the court to focus on the contractual relationship between the parties, rather than their professional status, in determining the existence of an independent duty of care. The interrelated contracts in this case contained BRW's and PSI's duty of care. Dufficy's tort claims are based on duties that are imposed by contract and therefore, contract law provides the remedies. Accordingly, the economic loss rule bars Dufficy's tort claims.

### Standard of Review

■■■■ We review the trial court's grant of a motion to dismiss or a motion for summary judgment de novo. *McIntyre v. Bd. of County Comm'rs*, 86 P.3d 402, 406 (Colo.2004). In reviewing a motion to dismiss, we accept all matters of material fact in the complaint as true and view the allegations in the light most favorable to the plaintiff. *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1259 (Colo.2000). A motion to dismiss is properly granted when the plaintiff's factual allegations cannot support a claim as a matter of law. *Rosenthal v. Dean Witter Reynolds, Inc.*, 908 P.2d 1095, 1100 (Colo.1995). A trial court may enter summary judgment when there is no disputed issue of material fact and the moving party is entitled to judgment as a matter of law. *McIntyre*, 86 P.3d at 406.

### A. Economic Loss Rule

We addressed Colorado's economic loss rule in *Town of Alma*. In that case, the town and AZCO construction had a contract for services that provided that AZCO would guarantee all materials, equipment, and the quality of the work performed. *Town of Alma*, 10 P.3d at 1258. When the water system began to leak, the town sued AZCO for damages under a negligence theory. We concluded that the contract assigned a duty of care to AZCO to perform the work and no independent duty of care existed to support the negligence claim.

We stated the economic loss rule as follows: "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Town of Alma,* 10 P.3d at 1264. When we adopted this rule, we thoroughly examined the origins and purposes of the economic loss rule in light of contract and tort law. The essential difference between a tort obligation and a contract obligation is the source of the parties' duties. *Id.* at 1262. Contract obligations arise from promises the parties have made to each other, while tort obligations generally arise from duties imposed by law to protect citizens from risk of physical harm or damage to their personal property. *Id.* "Contract law is intended to enforce the expectancy interests created by the parties' promises so that they can allocate risks and costs during their bargaining." *Id.*

### 1. Economic Loss Rule Applies to Interrelated Contracts

■ *Town of Alma* applied the economic loss rule to parties in a direct two-party contract. Here, Dufficy does not have a direct two-party contract with BRW or PSI. Dufficy argues that the application of the economic loss rule is limited to cases where the parties contracted directly with each other for their rights and obligations. Dufficy claims that it did not have an "opportunity ... to bargain directly with PSI and BRW over the risk of the harm which would result from defective specifications and negligent project administration." We disagree and hold that the economic loss rule applies when the claimant seeks to remedy only an economic loss that arises from interrelated contracts.

The economic loss rule applies between and among commercial parties for three main policy reasons, none of which depends upon or is limited to the existence of a two-party contract: (1) to maintain a distinction between contract and tort law; (2) to enforce expectancy interests of the parties so that they can reliably allocate risks and costs during their bargaining; and (3) to encourage the parties to build the cost consider-

ations into the contract because they will not be able to recover economic damages in tort. *Town of Alma,* 10 P.3d at 1262, 1264. *See Daanen & Janssen, Inc. v. Cedarapids, Inc.,* 216 Wis.2d 395, 573 N.W.2d 842, 846 (1998) (concluding that lack of a direct two-party contract does not affect these policies with respect to commercial parties).

In the context of larger construction projects, multiple parties are often involved. These parties typically rely on a network of contracts to allocate their risks, duties, and remedies:

> [C]onstruction projects are multi-party transactions, but rarely is it the case that all or most of the parties involved in the project will be parties to the same document or documents. In fact, most construction transactions are documented in a series of two-party contracts, such as owner/architect, owner/contractor, and contractor/subcontractor. Nevertheless, the conduct of most construction projects contemplates a complex set of interrelationships, and respective rights and obligations
> . . . .

*Fundamentals of Construction Law* 4–5 (Carina Y. Enhada et al., eds., 2001).

In such a contract chain, the parties do have the opportunity to bargain and define their rights and remedies, or to decline to enter into the contractual relationship if they are not satisfied with it. Even though a subcontractor may not have the opportunity to directly negotiate with the engineer or architect, it has the opportunity to allocate the risks of following specified design plans when it enters into a contract with a party involved in the network of contracts. In this situation, application of the economic loss rule encourages a subcontractor to protect itself from risks, holds the parties to the terms of their bargain, enforces their expectancy interests, and maintains the boundary between contract and tort law.

The policies underlying the application of the economic loss rule to commercial parties are unaffected by the absence of a one-to-one contract relationship. Contractual duties arise just as surely from networks of interrelated contracts as from two-party agreements. While this conclusion is a natural

progression from our holdings in *Town of Alma* and *Grynberg v. Agri Tech, Inc.*, 10 P.3d 1267 (Colo.2000), it is illustrative to consider the reasoning and conclusion in a Wyoming case with facts similar to those presented here.

In *Rissler & McMurry Co. v. Sheridan Area Water Supply Joint Powers Bd.*, 929 P.2d 1228 (Wyo.1996), the owner of a water project contracted with HKM for the design and preparation of site plans. Rissler submitted a bid to construct the project and was awarded the bid. Shortly after the project began, Rissler encountered problems and believed that HKM's specifications were faulty. Rissler requested that HKM modify the plans, but HKM refused. Rissler brought negligence and negligent misrepresentation claims against HKM. The Wyoming court held that the economic loss rule barred these tort claims, even though there was no contract directly between HKM and Rissler. The court explained:

> In this case, Rissler did not contract with HKM for the design of the Project and therefore had no opportunity to negotiate directly with HKM regarding the limits of its liability. However, Rissler had the opportunity to allocate the risks associated with the costs of the work when it contracted with the [owner]. . . .

*Id.* at 1235.

### 2. Application to this Case

The present case involves contractual duties that arose out of a network of agreements of which all parties had notice. The Project involved commercially sophisticated parties able to negotiate and bargain for an allocation of risks, duties, and remedies. Dufficy was aware that it would be bound by BRW's plans and specifications before it entered into a contract with Anko. Dufficy had the opportunity to allocate the risks that might occur in following BRW's plans and relying on PSI's inspection of the Project, but failed to do so. Rather, when Dufficy contracted with Anko, it agreed to be bound by BRW's plans and specifications and did not obtain provisions protecting itself from economic loss.

Moreover, as the Project's owner, the City impliedly warranted the adequacy of the plans and specifications. *United States v. Spearin*, 248 U.S. 132, 136, 54 Ct.Cl. 187, 39 S.Ct. 59, 63 L.Ed. 166 (1918) (explaining that the owner, not the contractor is responsible for the "consequences of defects in the plans and specifications"). This construction law remedy permits Dufficy to sue the City for economic loss due to faulty plans and specifications. Under Dufficy's contract with Anko, it was required to resolve all disputes regarding the contract, including the plans and specifications, pursuant to the City's administrative claims procedure. Thus, Dufficy bargained for this remedy, and the contracts' terms control. *Terrones v. Tapia*, 967 P.2d 216, 220 (Colo.App.1998)(barring owner's negligence claim against contractor under the economic loss rule even though parties did not have a direct two-party contract because source of contractor's duty was in contract); *Scott Co. of Cal. v. MK–Ferguson Co.*, 832 P.2d 1000, 1005–06 (Colo.App.1991) (barring subcontractor's negligence and negligent misrepresentation claims against project owner under the economic loss rule even though the litigating parties had not contracted directly with each other).

### 3. Source of Duty of Care is Determinative; Negligence Claim Barred

In the case before us, the court of appeals first determined whether an independent tort duty existed. It held that licensed engineers and inspectors owe subcontractors an independent duty of care to "employ that degree of knowledge, skill, and judgment ordinarily possessed by members of that profession." *Dufficy*, 74 P.3d at 384. In reaching this conclusion, the court of appeals did not examine whether the contracts created and contained the duties that BRW and PSI allegedly breached. Instead, the court applied a four-part analysis we have used to determine whether, in a negligence action, the defendant owed the plaintiff a duty of care. *See Taco Bell, Inc., v. Lannon*, 744 P.2d 43, 46–50 (Colo.1987) (applying four-part test and holding that a restaurant owed a customer a duty of care to make its premises safe).

In contrast, the holdings in *Town of Alma* and *Grynberg* require courts to focus first on the contractual context among and between the parties to see whether there was a contractual relationship that established the duty of care alleged to have been breached. *Grynberg*, 10 P.3d at 1269 (holding that the duty of care was contained in contractual provisions). *Grynberg* recognized three factors that aid in determining the source of the duty at issue: (1) whether the relief sought in negligence is the same as the contractual relief; (2) whether there is a recognized common law duty of care in negligence; and (3) whether the negligence duty differs in any way from the contractual duty. *Id.* at 1269–70. The court of appeals, having determined that BRW and PSI owed Dufficy a duty of care, failed to consider whether that duty differed from the duty arising out of the contracts.

■ If we conclude that the duty of care owed by BRW and PSI was memorialized in the contracts, it follows that the plaintiff has not shown any duty independent of the interrelated contracts and the economic loss rule bars the tort claim and holds the parties to the contracts' terms. *See Grynberg*, 10 P.3d at 1270; *Berschauer/Phillips Constr. Co. v. Seattle School Dist. No. 1,* 124 Wash.2d 816, 881 P.2d 986, 992 (1994) (explaining that, "[t]he construction industry ... would suffer [if tort and contract remedies were allowed to overlap], for it is in this industry that we see most clearly the importance of the precise allocation of risk as secured by contract").

The interrelated contracts in this case contain BRW's and PSI's duty of care, and Dufficy's remedies exist in contract. Dufficy's tort claims are based on duties contained in these contracts. In Dufficy's negligence claim against BRW, Dufficy asserts that BRW owed Dufficy "a professional duty to exercise reasonable care, including, but not limited to, preparing design drawings and specifications that were suitable for construction of the Project." Dufficy alleges that BRW breached this duty of care; thus, it is entitled to recover money damages under tort law.

However, the BRW contract itself required BRW to meet this standard of care. The BRW contract provides that the drawings and specifications prepared by BRW "must represent a thorough study and competent solution for the Project as per usual and customary professional standards and shall reflect all architectural and engineering skills applicable to that phase of the Project." The contract also states that the plans and specifications "shall be adequate and sufficient for the proper construction of the Project." Thus, the contract contains the duty BRW allegedly breached.

Similarly, Dufficy asserted a negligence claim against PSI. Dufficy's amended complaint against PSI states that "PSI did not exercise reasonable care when inspecting paint applications on the Project[,]" but such a duty is contained in the contracts. The BRW contract required BRW to inspect for compliance with the plans and specifications "as is necessary to determine that the work has been or is being installed in conformance with the Contract Documents." BRW had to perform this service "in accordance with the standards of care, skill and diligence provided by competent professionals who perform work ... of a similar nature."

BRW contracted with PSI to perform these inspection duties. The contract between BRW and PSI imposed a duty on PSI to perform its obligations with care and in a non-negligent manner. Thus, Dufficy's negligence claim against PSI is rooted in BRW's contractual obligation to inspect for compliance with the Project and PSI's contractual obligation to carry out this duty.

Accordingly, the economic loss rule bars the plaintiff's negligence claim. *Town of Alma* focused on the fact that the duty allegedly breached was contained in the contract. Here, the duties allegedly breached were contained in the network of interrelated contracts, and the economic loss rule applies.

### 4. Negligent Misrepresentation Claim also Barred

■ Dufficy's negligent misrepresentation claim against PSI and BRW also arises from a contractual duty. Dufficy's complaint alleges that BRW, through its agent PSI, re-

peatedly made inaccurate representations to Dufficy concerning how Coblaco was painting the Project. The BRW contract required it to inspect the plans and specifications with care, skill, and diligence. If any work was not in conformance with the contract documents, BRW was required to make a "verbal report of such nonconformance" followed by a written report. BRW hired PSI to provide these inspection services, and the contract between PSI and BRW required PSI to use care. The duty of care was contained in these contractual provisions.

Dufficy argues that the economic loss rule does not apply to claims for negligent misrepresentation. It reasons that, quoting from *Jardel Enter., Inc. v. Triconsultants, Inc.*, 770 P.2d 1301, 1305 (Colo.App.1988), "[i]f a negligent misrepresentation claim were dismissed only because recovery is sought for 'economic loss' and because the representations were made 'in the course of rendering a service pursuant to a contract,' nothing would be left of the tort of negligent misrepresentation." Dufficy also relies on *Keller v. A.O. Smith Harvestore Prod. Inc.*, 819 P.2d 69 (Colo.1991) to support its argument.

In *Keller*, we held that "a contracting party's negligent misrepresentation of material facts *prior to the execution of an agreement* may provide the basis for an independent tort claim." 819 P.2d at 72 (emphasis added). In contrast, the alleged negligent misrepresentation complained of in this case occurred during performance, by which time the parties had bargained for the allocation of risks, duties, and remedies. Dufficy failed to protect itself from economic loss arising from PSI's alleged misrepresentations, and the contracts' terms are controlling. As the Washington Supreme Court explained: "[w]e ... acknowledge ... the tort of negligent misrepresentation.... We hold that when parties have contracted to protect against potential economic liability, as is the case in the construction industry, contract principles override tort principles ... and, thus, purely economic damages are not recoverable." *Berschauer/Phillips Constr. Co.*, 881 P.2d at 993 (internal citations omitted).

The contract between PSI and BRW contained the duty to carefully and non-negligently report on the Project's status. Because Dufficy alleges that PSI breached this duty, and the duty is contained in the interrelated contracts, the economic loss rule bars the negligent misrepresentation claim. *Scott Co.*, 832 P.2d at 1006 (holding that the economic loss rule barred plaintiff's claim for negligent misrepresentation); *Rissler*, 929 P.2d at 1235 (holding that a construction contractor could not sue the project engineer for negligent misrepresentation because of the economic loss rule).

## III.

Accordingly, we reverse the judgment of the court of appeals. We uphold the trial court's order dismissing Dufficy's tort claims under the economic loss rule.